## MANUAL HUNTER, Appellant, v. BUSY BEE CANDY COMPANY.

### Division One, April 13, 1925.

1. **NEGLIGENCE: Safe Place: Removing of Obstruction: Assistance of Others: Proximate Cause.** The master owes to his servant the duty to furnish him a reasonably safe place in which, and reasonably safe and suitable appliances with which, to work; and when the work is of such nature as to require men to do the work, men engaged in the work are classified in the same category as appliances; and where the servant charges that his injuries were due to the failure of the master to furnish him other requested workmen and appliances necessary to do the work, the question is whether such failure was the proximate cause of the injuries.

2. ————: **Moving Automobile: Request for Help: Subsequent Strain: Proximate Cause.** Plaintiff was engaged in driving a wagon loaded with boxes of candy to his master's store, where the goods were to be placed in a basement, by means of an elevator which came up through the sidewalk. To conveniently place the boxes on the elevator it was necessary that the wagon be placed immediately opposite the elevator. When an automobile occupied that space it was usual to move it away, the driver alone moving it if he could, but if it was too much for his strength he applied to the manager for help, and such help was usually furnished. On a certain afternoon, when his wagon drew up to the store, he found a large automobile standing in the space in front of the elevator, and attempted to move it, but finding he could not do so alone applied to the manager, who was inside the store and did not see the obstructing automobile or know its size, for other men to help him move it, and testified that he was told that the goods must be placed in the basement and no help would be given him. Thereupon he returned to the automobile, braced his body against it and using all his strength succeeded in slowly rolling it away. The exertion caused a rupture of a blood vessel in his brain, and as a result of the rupture the right side of his body was paralyzed. *Held,* that the rup-

Hunter v. Busy Bee Candy Co.

ture of the blood vessel was not a result that the master should have foreseen or anticipated, and was not a direct result of the master's failure to furnish him a helper or suitable appliances, but its proximate cause was the strain and overexertion and a misconception of his own strength, for which the master is not liable. The servant assumes the risk of injury from voluntary violent strain and overexertion.

3. ———: ———: Choosing Dangerous Method. The servant cannot recover damages for his personal injuries if he chose the dangerous method of accomplishing the ultimate end of his work when he might have accomplished the same result by using a safe method. Where it was usual, in unloading a wagon, in which were one hundred boxes, each containing five pounds of candy, to place it opposite an elevator which came up through the sidewalk and then to place the boxes on the elevator and lower it into the basement, and the space opposite the elevator was temporarily occupied by a big automobile, and the driver, having discovered that he could not move the automobile out of the way alone, applied to his master for help and was told only that no help would be given him and that the goods must be placed in the basement, and thereupon, after sitting on the wagon twenty-five minutes to see if the owner of the automobile would not come and take it away, he undertook to push it out of the space, in order that he might place his wagon there and more conveniently unload it, and in doing so so strained and overexerted himself as to cause the rupture of a blood vessel in his brain, when by carrying the small boxes a short distance in his hands and placing them upon the elevator he would have escaped such injury, and accomplished the same ultimate end of his work, he cannot recover damages from his master, since he had as good an opportunity as his master of seeing what the danger was, was permitted to unload the wagon in his own way, and could have avoided the injury by the exercise of reasonable care, and the mere fact that the safe method involved more trouble and labor did not excuse his choice of the dangerous method.

Citations to Headnotes: **Master and Servant**, 1, 26 Cyc. 1098, 1149; 2, 26 Cyc. 1195, 1442; 3, 26 Cyc. 1258, 1456.

Appeal from St. Louis City Circuit Court.—*Hon. George E. Mix,* Judge.

Affirmed.

307 Mo. Sup.—42.

*Wm. R. Schneider* for appellant.

(1) The servant does not assume risks of his employment that are caused by the master's negligence. Williams v. Prior, 272 Mo. 613; Trill v. K. C. So. Ry., 216 S. W. 572; Walsh v. Union Quarry Const. Co., 223 S. W. 1085. (2) The only way a servant can be denied recovery because of danger or risks created by the master's negligence is by doing work at the behest of the master the danger from which is so great and obviously apparent as to threaten immediate and certain danger. It then becomes a question for the jury whether the danger was so imminent and obvious that the servant was guilty of contributory negligence in doing the work. Patrum v. Ry. Co., 259 Mo. 109; Bowman v. Elec. Light Co., 213 S. W. 161. But unless the danger was so apparent that no reasonably prudent man would think the work could be done safely, he should not be barred from recovery on the ground of contributory negligence. Bowman v. Elec. Light Co., 213 S. W. 161; Thorp v. Mo. Pac. Ry. Co., 89 Mo. 650; Stoddard v. Railroad Co., 65 Mo. 514; Trill v. K. C. So. Ry., 216 S. W. 572. (3) It is the duty of the master to exercise ordinary care to provide his servants with reasonably sufficient help to enable them to do with reasonable safety to themselves the work which the master requires of them. Meily v. Railroad, 215 Mo. 567; Lavecke v. Curtis Mfg. Co., 197 Mo. App. 273; Haviland v. Railroad Co., 172 Mo. 106; Trill v. K. C. So. Ry., 216 S. W. 572. (4) Paralysis frequently results from violent exertion and should have been foreseen by the master whose order was an implied assurance of safety to the servant. Fowler v. Bottling Co., 175 N. Y. App. Div. 224, 161 N. Y. Supp. 535; St. Clair v. Meyer Music House, 178 N. W. 705; La Veck v. Park Davis Co., 190 Mich. 604; McInnes v. Dunsnier & Jackson, Ltd., 1 B. W. C. C. 226; State ex rel. Puhlmann v. Dist. Ct., 137 Minn. 30. (5) The liability of a master charged with negligence does not depend upon the question whether with the exercise of reasonable prudence he could or ought to have foreseen the very in-

jury complained of; but he may be held liable for anything which after the injury is complete appears to have been a natural and probable consequence of his act or omission.   Washburn v. Laclede Gas Light Co., 213 S. W. 414; Smith v. Greer, 257 S. W. 829; Dean v. Ry. Co., 199 Mo. 411; Buckner v. Horse & Mule Co., 221 Mo. 710.

*Lewis & Rice, Percy Werner* and *Foristel, Mudd, Hezel & Habenicht* for respondent.

(1)   The failure to furnish the plaintiff assistance in his attempt to remove the automobile does not constitute negligence on the part of the defendant.   Haviland v. Railroad, 172 Mo. 109; Leitner v. Grieb, 104 Mo. App. 173; Petrilli v. Swift & Co., 260 S. W. 516; Lively v. Railroad, 225 Pac. 103; Kampeen v. Ry. Co., 189 N. W. 123; Hines v. Cox, 232 S. W. 373; Williams v. Ry. Co., 207 Ill. App. 517; Sandy Valley Railroad Co. v. Tackitt, 167 Ky. 756; Stenvog v. Ry. Co., 108 Minn. 199; Worlds v. Railroad Co., 99 Ga. 283; Haywood v. Railroad Co., 38 Tex. Civ. App. 101.   (2)   But such failure, even if negligent, was not, in law, the proximate cause of plaintiff's injury.   State ex rel. v. Ellison, 271 Mo. 463; Washburn v. Gas Light Co., 214 S. W. 410, 284 Mo. 181; State ex rel. v. Ellison, 271 Mo. 463; De Moos v. Rys. Co., 296 Mo. 526.

SEDDON, C.—Suit for damages for personal injuries alleged to have been sustained by plaintiff while in defendant's employment.

The substantive allegations of the petition are these: "Plaintiff states that on or about the 9th day of July, 1920, and for several years prior thereto he was in the employment of the defendant company, engaged in hauling candy by means of a horse and wagon from the defendant's factory in the city of St. Louis, Missouri, to its various retail stores in said city; that in doing said work it frequently became necessary to push or pull out of the way automobiles which had been parked at the street curb in front of the place where plaintiff was re-

quired to unload the candy at the defendant's Broadway store; that when it became necessary to push or pull such automobile out of the way and plaintiff was unable, by the exercise of reasonable exertion to do so by himself, it was customary for plaintiff to request assistance from the defendant's manager in charge of said store, who would send a man to help plaintiff; that on the 9th day of July, 1920, plaintiff found it necessary, as aforesaid, in the course of his employment, to request, and he did request, the defendant's manager in charge of said store, to send a man to help plaintiff move an automobile which stood in the place where plaintiff was at said time required to place his wagon in order to unload the load of candy which he then had on his wagon, and was required by the defendant to unload at said place; that defendant's said manager failed and refused to provide the plaintiff with a man to assist him and ordered and required plaintiff to move said automobile by himself. Plaintiff thereupon proceeded to comply with the said order, instructions and directions of the defendant's said foreman or manager, whom he was required by the defendant to obey. And while pushing said automobile out of the way, as he was directed, he suffered a rupture of a blood vessel in his brain as a direct result of the violent exertion occasioned by being required to do said work by himself and without assistance, as aforesaid. Plaintiff states that as a result of said rupture of the blood vessel of his brain the entire right side of his body became paralyzed and has so continued since July 11, 1920. Plaintiff states that his said injury and resultant paralytic condition was caused by and was and is the direct result of the carelessness and negligence of the defendant: First, In failing to provide the plaintiff with another man to help him do the work in which he was injured, as aforesaid, when the defendant knew, or in the exercise of ordinary care could have known, that it was dangerous and unsafe to require plaintiff to do said work by himself, and the defendant knew, or by the exercise of ordinary care could have known, that the plaintiff was unaware of said danger, and the defendant

knew, or in the exercise of ordinary care could have known, that it required at least two men to move said automobile with reasonable safety. Second, Plaintiff's said injury and paralytic condition was directly caused by the carelessness and negligence of the defendant in failing to exercise ordinary care to furnish plaintiff with reasonably proper and necessary tools and appliances so he could, with reasonable safety, do the said work which he was required by the defendant to do, and in which he was injured, as aforesaid, in that it failed to provide the plaintiff either with a lever bar or sufficient man power, and if either had been provided plaintiff's said injury would have been avoided. Third, Plaintiff's said injury and paralytic condition was directly caused by the carelessness and negligence of the defendant in ordering plaintiff to do the said work, in which he was injured, as aforesaid, in a way that was not reasonably safe, in that he was required to do it without either a lever bar or sufficient man power to assist him, which the defendant knew, or in the exercise of ordinary care could have known, was a dangerous, improper and unsafe way to require plaintiff to do said work and therefore likely to result in the injury plaintiff suffered, as aforesaid, and the defendant knew, or in the exercise of ordinary care could have known, that the plaintiff was unaware of said danger." The petition prays damages in the sum of $65,000.

Defendant's answer was a general denial and the following special defense: "Further answering, defendant states that if the plaintiff attempted to move an automobile as stated in his petition, and if plaintiff sustained injuries while so doing, or as a direct result thereof, the same directly and proximately resulted from negligence and carelessness of plaintiff contributing thereto, in this, that the plaintiff negligently attempted to push and move said automobile, and negligently pushed said automobile with too great force and effort, and negligently failed to refrain from straining himself, and defendant further states that the plaintiff fully

and knowingly assumed whatever risk and danger there was in doing such work as aforesaid.''

The reply was a general denial.

The facts relied upon by plaintiff for recovery may be best stated in his own words. On direct examination, he testified:

''I am fifty-eight years old. I was employed by the defendant Busy Bee Candy Company in St. Louis in 1920, driving a one-horse wagon, hauling candy from the defendant's factory to its Broadway store and its Sixth and Olive Street store. I was employed in that capacity for six years and six months. Mr. Schottgen, the defendant's general manager, gave me orders as to what work I was to do. He is located at the Seventh Street store; that is his headquarters. When I went to the defendant company's Broadway store I was to take orders from Mr. Gibson and Mr. Sid Worth, the manager and assistant manager, so Mr. Schottgen told me. The Broadway store was on the west side of Broadway, fronting east; in front of it, coming up from the basement of the store through the sidewalk, was the elevator. The space through which the elevator would come up through the sidewalk was covered with shutters or doors when the elevator was not in use. When I would come around with a load of candy, and there was no automobile parked in front of the elevator, I would back up to the elevator, open the doors, roll the candy truck from the wagon onto the elevator, then punch the button for the porter down in the basement to come to the elevator and get off the goods. Very often there would be automobiles parked in front of the elevator. I would go and look the car over, and if I would see I couldn't make it I would release the brake and I would ask for help to help me remove it. When I could release the brake and push the car myself I would push it away from in front of the elevator myself. When it was a big, heavy car and I could not get in to release the brake I would ask for help—the manager or assistant manager at the Broadway store, whichever one I would come to first. Sometimes I would ask one, sometimes the other. Lots

of times I went in and asked for help to push an automobile away from in front of the sidewalk elevator. On Friday afternoon, about 2:30, July 9, 1920, I drove up to the Broadway store with a load of candy and there was a big, heavy machine standing in front, right where I had to get in to take off my load. I looked the machine over and I thought it looked like it was too heavy for me to push down, and I went in and asked for help, and I went and asked the manager or assistant manager, I don't know which, for help, and he said I would have to do it myself, for they had to have the goods and he had no help for me. That was on Friday, which is the day they have their special sales at the Busy Bee Candy Company. I found out I couldn't get into the car to release the brake, and so I went in and asked for help. It looked to me like an electric coupe, a very heavy car, passenger car; it was glassed in all the way around. After the manager or assistant manager told me that they didn't have any help I went back and backed myself up against it and commenced to push it, and I found out I could move it just by degrees, and so I kept on pushing and twisting it with my back, and I pushed it down about ten feet so I could get in, and when I quit pushing it seemed like something just slapped me up against the side of the head. I used all my strength to push the car, all the strength I had. It took me about five minutes; I would just push a little bit at a time. After I quit pushing I had a feeling as if someone slapped me on the side of the head; my head felt dizzy, and my head went around and around, and I started to go to the wagon and I stood there a few seconds—I don't know how long—but it seemed like if everything was turning real green and I was blind, and then I waited and backed the wagon to the elevator hole, and then it felt like my head was swelling and I stood there a few seconds, and then I raised the door, and when I raised the door I punched the button for the porter to come and release and send the elevator up so I could take off my goods. All the time I had a severe headache. All that afternoon and all night and Saturday all day, and Satur-

day night and Sunday all day. Never slept any. I don't remember that I had any rest at all. I worked Friday afternoon and Saturday all day, but Sunday I didn't work none.''

On cross-examination, he testified: ''On this day I had approximately five hundred pounds of candy on my wagon, put up in five-pound boxes. I took a hook and raised the doors open so that the elevator could come out. The elevator comes up three or four feet above the sidewalk, level with the window, so we can drop this big door down and we can load out the big truck. The porter does not come up on the elevator. He stays down there and takes it off. When I push the electric bell it rings on all the two or three floors, which calls the porter to the basement so I can shove the candy down to him. The electric coupe that was standing in front of the elevator looked to me like it was a good-sized car. I don't remember how long it was, or how many seats it had. I sat on my wagon twenty-five or thirty minutes to see if the party would come and take the car away. Then I got off and looked the car over and I looked around and I couldn't get in to release the brake and it looked too heavy for me to try to move by myself, and I went in the store and asked for help.

''Q. Was there anything to keep you from staying there if you wanted to? A. I don't know; at that time I wasn't supposed to stay there that long.

''Q. And nobody complained anything about that, did they? A. Nobody knew I was there. I did not ring the bell for the porter. I wasn't supposed to ring it. I didn't ring the bell until after I went and asked for help. I don't remember who it was I asked. I don't know if it was the manager or assistant manager, but I spoke to one of them. He told me he had no help for me. I would have to do it myself, as they had to have the goods.

''Q. That was the whole conversation; you simply went in and said give me some help to move an automobile? A. Yes, sir; that is all I remember about it.

"Q. Then he answered the way you said he answered? A. I would have to do it myself, got to have the goods. I went out then and put my strength against the car. I did not look the car over again to see if I could release the brake. I had already looked it over once. I have moved automobiles myself when I could release the brakes. There was a tire on the back end of the car. I put my hand down under the rim of the tire and then I took my back and pushed it away, and put my heels down this way. It is a block street there, and there is just enough of a slant towards Washington Avenue for the water to run that way. Yes, it was slightly downhill. When I put my strength against the automobile it would move just a little, but when I quit it wouldn't move anymore. I don't know how many times I pushed it to move it the ten or twelve feet.

"Q. You knew each time you were pushing it that you were straining your strength to do it? A. I didn't know I was injuring myself.

"Q. I didn't say injuring, but I mean you were straining yourself? A. Yes, sir.; to push it down. To the best of my recollection it took me five or ten minutes. I was giving the best strength I had.

"Q. And then after that, after you got the car down, you backed your truck in and unloaded it? A. After I quit pushing?

"Q. You backed your truck in and then you opened the door? A. After I quit pushing there was something felt like something slapped me on the side, and I walked over to the wagon to get on the wagon and I stood there for a few seconds, and then I got up on the wagon and then I pulled it down and backed in, and when I backed in I raised up the elevator door to get the elevator to the hole, and after I got the door open and started to get the side pieces unhooked, then I rang the bell. The porter never did come up on the sidewalk. He stayed down in the basement and I pushed the goods off the wagon. I wasn't supposed to ring for the porter or open the door until I had got everything ready. Then I would ring for the porter to take the load."

On redirect examination, he testified: "Q. Was there anything to prevent you from driving in just south of that automobile to the curb? A. Well, I couldn't get to the curb close enough to put my load over the elevator hole. The door was fixed so I could roll the truck out of the wagon onto that elevator and let it down in the basement. I would have to be at a certain place; if I was a foot too far back I couldn't get the truck over it good then."

Medical testimony was adduced tending to prove that plaintiff's physical condition could have resulted by reason of the facts to which he testified. No other testimony was offered by plaintiff.

At the close of plaintiff's case, an involuntary non-suit was entered of record, with leave to move to set it aside and for a new trial, and, from the order of the trial court overruling his said motion, plaintiff in due time appealed to this court.

I. It is axiomatic that a master owes to his servant the duty of furnishing him a reasonably safe place in which to work and also reasonably safe and suitable appliances with which to do his work. Furthermore, when the work is of such nature as to require men to do the work, then the men engaged in the work are classed in the same category as appliances. This duty, however, does not make the master an insurer of the safety of the servant, for, on the other hand, the servant assumes the risks that are ordinarily incident to and inherent in the work itself. [Haviland v. Railway Co., 172 Mo. l. c. 112.] But the servant does not assume risks of his employment that are caused by the master's negligence. [Williams v. Pryor, 272 Mo. 613; Tull v. Railway Co., 216 S. W. (Mo. App.) 572.] And, unless the danger or risk occasioned by the master's negligence is so glaring and obviously apparent to the servant as to threaten immediate and almost certain danger, then the servant neither assumes the risk nor can he be held guilty of contributory negligence as a matter of law. [Thorpe v. Railway Co., 89 Mo. 650; Patrum v. Railroad

*Proximate Cause: Strain: Anticipated Injury.*

Co., 259 Mo. 109; Bowman v. Electric Light Co., 213 S. W. 161.] Again, it has been said that, unless the danger was so apparent that no reasonably prudent man would think the work could be done safely, he should not be debarred from recovery on this latter ground. [Bowman v. Electric Light Co., supra; Thorpe v. Railway Co., supra.] But, in the final analysis, we think the question resolves itself into one of proximate cause. Therefore, the legal question here to be determined by us is, was plaintiff's injury, if any, the proximate and immediate result of defendant's negligence in failing to furnish him with sufficient appliances or help to do the work required of him, having in mind his request made of the master for such help, or, on the other hand, was his injury the proximate and immediate result of plaintiff's own negligence or assumption of the risk?

Plaintiff claims that the defendant was guilty of negligence in failing either to furnish him with another helper, after a request made to the master therefor, or proper and necessary appliances, with which to remove the automobile from in front of defendant's store, and that the injury he claims to have suffered, in endeavoring to push the automobile out of his way, was a proximate and direct result of said negligence of defendant. Furthermore, that, in directing him to remove the automobile by himself, without the assistance of a helper, the defendant thereby impliedly assured him that he could do the work alone safely, and that the danger of doing so was not so great and obviously apparent to plaintiff as to threaten immediate and certain danger to him. Plaintiff has cited numerous authorities which he claims support his contention. But in all of those cases, the injury was the proximate result of negligence on the part of the master in failing to provide necessary help and which result should reasonably have been foreseen by the master because of his superior knowledge, or, was the result of other independent but connected causes, coupled with negligent failure of the master to furnish help in the doing of the work required. For instance, in Bowman v. Electric Light Co., 213 S. W. 161, the in-

jury was caused by reason of one end of a pole slipping upon a skid; Meily v. Railroad Co., 215 Mo. 567, car wheels rolling back upon the injured party; Tull v. Railway Co., 216 S. W. 572, the weight of a tie causing the injured party to slip and fall on a slippery embankment; Thorpe v. Railway Co., 89 Mo. 650, failure of engineer to receive a stop signal; Stoddard v. Railway Co., 65 Mo. 514, injured party's foot was caught in a spring frog; Fogus v. Railway Co., 50 Mo. App. 250, a careening and unbalanced fly-wheel; Keegan v. Kavanaugh, 62 Mo. 230, an insufficiently propped or supported embankment; and Levecke v. Manufacturing Co., 197 Mo. App. 262, where a fellow workman let down his end of a plank supporting a heavy motor, causing the motor to fall upon the injured party. But in none of the cases cited was the injury the result of a strain or overexertion of physical strength on the part of the injured party.

Here, according to plaintiff's own testimony, it is apparent that he was injured as a direct result of his own overexertion and effort to do more than his physical strength would permit. His knowledge of his own physical strength and limitations was necessarily superior to that of the master. Under such circumstances, according to well-reasoned authority, the master cannot be held liable for consequent injuries, and this is true whether the established rule be founded on assumed risk or contributory negligence of the injured servant. In Haviland v. Railroad Co., 172 Mo. 106, a case where the servant was injured by his own act in employing more strength or effort than was necessary in pushing a heavy steel rail up a greased incline, a recovery for the injury was denied, and this court in its opinion quoted with approval the following language from Worlds v. Georgia Railroad Co., 99 Ga. 283: "Where an employee of a railroad company, in the discharge of his duties, is directed to lift and carry an ordinary object, like a cross-tie, he is bound to take notice that it is heavy, and that a certain amount of physical strength will be required to accomplish the task; and if he misconceives the amount of physical strengths to be exerted, and overstrains himself in lifting

the tie, and is thereby injured, the master is not liable. The fact that he was acting under the orders of a superior at the time does not alter the question, even though he might have had reason to believe that disobedience of the order would result in his dismissal.''

In Petrilli v. Swift & Co., 260 S. W. 516, plaintiff was pulling a heavily loaded truck of meat, ordinarily handled by two men, up an incline, when the truck began to go back down the incline. Plaintiff tried to pull it up and to hold the truck from going down, and in doing so suffered a rupture. In denying a recovery, the Kansas City Court of Appeals said: ''It will be observed that plaintiff himself had reached the top of the incline and was standing on the level endeavoring to pull the truck up the last five inches of the incline, and that he strained and ruptured himself in the attempt. The truck was not above him nor in danger of falling upon him, nor was there anything in the situation which rendered it urgently necessary that he should at all events prevent the truck from going back down the incline. He was not suddenly placed in a situation where he must exert himself to the utmost and at all hazards or else be injured otherwise. He was not in an emergency subjected to a sudden and unexpected force or strain coming upon him which he must bear lest some other accident or tragedy befall. He was under no obligation to pull beyond his strength, but, at the limit thereof, or before, could have allowed the truck to go back down the incline without injury to himself or anyone else. His injury did not arise because he fell, or slipped, or met with any untoward happening. It arose simply because he overexerted himself. The authorities hold that, under such circumstances, the servant is the judge of his own strength, and not being under any necessity to exert himself beyond it, he cannot recover damages for injuries arising merely through lifting or overexertion. The danger of strain or rupture from overexertion under such circumstances is held to be one of the risks incident to his employment which he impliedly assumes.''

In Leitner v. Grieb, 104 Mo. App. 176, the same court said: ''The question is therefore one of principle and not of precedent. It is like this: The master directs his servant to perform a certain service; the servant objects because he thinks it beyond his power to perform it alone and unaided, or that he ought to have assistance in the work; the master tells him if he does not choose to undertake it, to quit his service. The servant does, however, attempt to perform the service and is injured, not by reason of any defect in the tools or appliances, or the place furnished for the servant, but because he has undertaken that which he knows is beyond the reasonable exercise of his power. And furthermore, we know of no rule of law that holds the master liable in damage for an injury to his servant that cannot reasonably be anticipated and guarded against by the exercise of proper care. Here, the servant assumed the risk. To hold otherwise would be holding that the master is an insurer of the safety of his servant while in his employ.''

The rule is amply supported by cases of other jurisdictions. [Lively v. Railway Co., 225 Pac. (Kan.) 103; Kampeen v. Railway Co., 189 N. W. (Minn.) 123; Stenvog v. Railway Co., 108 Minn. 199; Hines v. Cox, 232 S. W. (Ky.) 373; Sandy Valley Railway Co. v. Tackitt, 167 Ky. 756; Williams v. Railroad Co., 207 Ill. App. 517; Roberts v. Railway Co., 158 Ind. 634; and Ferguson v. Cotton Mills, 106 Tenn. 236.]

But, furthermore, there is no proof in the instant case, nor any facts from which the inference may be drawn, that defendant's manager or assistant manager, in directing plaintiff to do the work himself, should or could have foreseen that he would strain or overexert himself and thus bring about the rupture of a blood vessel in his brain. Plaintiff says he asked ''for help'' and was told by his superior that ''I would have to do it myself, for they had to have the goods and he had no help for me.'' Thus far it does not appear that his superior knew why or for what purpose the help was wanted. But, on cross-examination, he testified, ''I went in the

store and asked for help. I don't know if it was the manager or assistant manager, but I spoke to one of them. He told me he had no help for me. I would have to do it myself, as they had to have the goods." Whereupon, he was asked the question, "That was the whole conversation; you simply went in and said give me some help to *move an automobile?*" to which he answered, "Yes, sir; that is all I remember about it." So that, if we are permitted to indulge the inference that the defendant's representative or vice-principal knew that plaintiff was seeking help to move an automobile, nevertheless, there is no evidence in the record that plaintiff told his superior anything as to the size, kind or type of automobile, its location, whether it was locked or unlocked, or the necessity for its removal. In fact, it does not appear that the master's representative, whom we assume from the testimony was about his own duties inside of the store, saw, or had knowledge of, the weight, size, character or location of the automobile, nor does it appear that plaintiff told him about any of these things. In that state of the record, plaintiff's injury was not reasonably to have been anticipated by defendant, and, hence, was not the proximate result of defendant's negligence.

In State ex rel. v. Ellison, 271 Mo. l. c. 472, we said: "If the injury was not one reasonably to have been anticipated as a sequence to the failure of the engineer, then such failure was not, in law, the proximate cause of the injury. This doctrine is announced in American Brewing Assn. v. Talbott, 141 Mo. l. c. 683, whereat we said: 'Numerous authorities hold that it is not negligence not to take precautionary measures to prevent an injury which, if taken, would have prevented it, when the injury could not reasonably have been anticipated and would not, unless under exceptional circumstances, have happened.' In the same case, 141 Mo. l. c. 684, we quote with approval the following from 'Negligence of Imposed Duties' by Ray: 'The proper inquiry is not whether the accident might have been avoided if the one charged with negligence had anticipated its occurrence,

but whether,' taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence.' . . . From it all, we take it, that the established rule of this court is that if the injury, as occasioned, was not one which could have reasonably been anticipated as a sequence of the alleged negligent act, then the alleged negligent act was not in law the proximate cause of the injury, and no recovery can be had therefor." Of similar import, and to the same effect, is DeMoss v. Railways Co., 296 Mo. 526.

II. But there is another reason why the court *nisi* properly denied plaintiff a recovery in this action. Plaintiff, so far as the record here shows, apparently selected the more dangerous method' of accomplishing the ultimate end of his work, when he might have accomplished the same re-sult by adopting a safer, in fact, an absolutely safe method. There is nothing in the record before us which indicates that defendant's vice-principal ordered plaintiff to remove the automobile for the purpose of unloading his wagon at that particular place and none other. While we might, perhaps, indulge the inference that plaintiff requested help to assist in removing the automobile, nevertheless, the reply he received from defendant's vice-principal clearly indicated that all that defendant was interested in, and the ultimate result to be accomplished by plaintiff's work at the time, was that defendant "had to have the goods," i. e., the candy then loaded upon the wagon. The candy weighed about 500 pounds and was, according to plaintiff's evidence, put up in five-pound boxes. The elevator, upon which the candy was to be loaded from the wagon, lifted from the basement of the store to the sidewalk, where the candy could either have been rolled from the sidewalk in a truck onto the elevator, or the five-pound packages of candy could have been lifted from the wagon a few at a time, carried to and placed upon the elevator. Then, again, plaintiff might have backed his wagon to some point at the sidewalk line on either side of the standing automobile, and

*Choosing Dangerous Method.*

rolled or carried the candy from that point to the elevator. Plaintiff's answer to a question propounded by his own counsel on re-direct examination, "I would have to be at a certain place; if I was a foot too far back I couldn't get the truck over it (the elevator) *good* then", rather indicates that his purpose in backing the wagon directly in front of, or in apposition to, the elevator was one of convenience merely and, perhaps, less troublesome than the safer method of unloading the wagon which was available to him. Time does not seem to have been a very important element in the unloading of the wagon for, on plaintiff's own statement, he sat on the wagon twenty-five or thirty minutes "to see if the party would come and take the car away," and during that time he certainly could have unloaded the wagon by carrying the candy, a few packages at a time, from the wagon to the elevator.

In 3 Labatt on Master and Servant (1913 Ed.) sec. 1249, the text-writer, quoting from Lothrop v. Fitchburg Railroad Co., 150 Mass. 423, says: " 'The general rule of law is that, when the danger is obvious, and is of such a nature that it can be appreciated and understood by the servant as well as by the master or by anyone else, and when the servant has as good an opportunity as the master or as anyone else of seeing what the danger is, and is permitted to do his work in his own way, and can avoid the danger by the exercise of reasonable care, the servant cannot recover against the master for injuries received in consequence of the condition of things which constituted the danger. If the servant is injured, it is from his own want of care.' " Continuing, the author expresses therefrom this conclusion: "The mere fact that the safer method is one which involves considerably more trouble than the more dangerous one is no excuse for adopting the latter." [Citing numerous cases supporting the conclusion.] And so this court has ruled in Moore v. Railway Co., 146 Mo. 572, and Hurst v. Railroad Co., 163 Mo. 309.

The trial court committed no error in denying plaintiff a recovery upon the facts in evidence, and in refusing

to set aside the involuntary non-suit taken. The judg-ment *nisi* is accordingly affirmed. *Lindsay, C.* concurs.

PER CURIAM:—The foregong opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur; *Graves, J.*, in the result.